We appreciate your being here this morning. We have two cases on our docket, but we are also mindful of our time limits, which we endeavor to apply for the sake of equality among the cases. So when the yellow light comes on on the podium, you have two minutes left. When the red light comes on, we appreciate you're concluding your remarks unless you're answering a question from the bench. We have read the briefs and record excerpts. We may not have read the entire record, so we will appreciate record citations. First case is number 2340680, United States v. Bennett, and we'll hear first from Mr. Bennett. Good morning. Good morning. David Bennett, Holland and Knight for the defendant. The issue before the court today is a narrow one that requires the court to consider one of the most bedrock principles, constitutional principles imaginable, that is the sanctity of property under the Fifth Amendment. But what the court has certified, and we certainly appreciate you doing that, so that we could avoid, so we have the rules applied correctly in the lower court when we do go to trial, is the issue of whether, of how you calculate damages and whether you exclude improvements from the damage calculations. The government filed this case in July of 20. It's a condemnation case. We didn't oppose title passing to the government in the property in question. What made this case unusual, maybe unprecedented, though, is that on the date of the taking, there were improvements to the property that the government had built 12 years before without permission, without color of title, and in two different depositions of Mr. Flossman, the guy that was in charge of this project, he testified that they didn't check title, didn't check rights in the property before they entered the property and built it. They had had the easement since the 1930s, and what you're talking about here, just to clarify, is building the wall, the concrete with the metal wall on top of it in 2008? That's exactly right. The testimony in the two depositions, though, was that they did not check with the International Boundary and Water Commission with respect to the scope of that easement. Yes, ma'am. All right, but the current condemnation, then, does not include more fiscal land. Is that right or not? It includes both the footprint of the original easement and an additional acre and a third, I think, Your Honor, so it is the entire...  I beg your pardon. I'm sorry. For the road, the additional acres for... That is the contention of the government. The road actually already existed. That's actually a fact question. They contend that they condemned this. We say it's a pretext. If you look at the descriptions of the property that are attached to their complaint, you can see very clearly in the exhibits that have illustrations, detailed illustrations of the property, there's a county road that was on top of the levee that still exists, and then there's a, quote, private road at the bottom of the wall. That's the security road. So that security road existed at the time, and their contention that they initiated this action to build a road as a pretext, it already existed. Now, it may be that that road actually went outside the easement. It's not clear to me, and so that may be the explanation that they're seeking more acreage than just the footprint of the wall. Maybe, and we're not sure. Again, it's a fact issue we want to do discovery on. Maybe the fact that the road or other improvements that they built in advance of this complaint actually exceeded the easement. So they would have had, with respect to those improvements, they would have had no color of title because it was on our property without the easement. But our contention is that this wall was built and existed in the condition that it exists today when this complaint was filed, and that not a single change has been made since then. All of the pretext that they contend belie the fact that what really happened here is they figured out that we owned it and they didn't, and they needed to clean up title. And this is the only time they did this. Luckily, ever since then, they've either bought the property first or initiated a condemnation action. So this is a unique set of circumstances, both with respect to the construction of the wall and, frankly, in the case law. I have one other question about the physical property. We saw the property description. Where's the river? It's about a mile south of there. And in fact, that's one of the key components of this case. And you really have to imagine. Does the Bennett property go all the way down to the river? Our southern, excuse me, the defendant's southern boundary is an international boundary line. So it's the middle of the river. And so one of the things about the wall that is confusing is it's not built on the international boundary line. It actually creates kind of a no man's land. But it's obviously flood prone. Absolutely, Your Honor. And in the 30s, there was built, well, actually, the land itself was adjusted, is the best way I could put it, to put what was a mound, which was constituted a levee that was camouflaged, really had grass. You could hunt dove on it, which we did many times. And deer, there's actually an environmental easement south of us. And wildlife could get across that. It is just, I mean, it's res ipsa that this wall is not a levee. It's just almost hard to articulate, even for the government, something that looks for all intents and purposes. Well, I said in the lower court, it was a few rows of razor walls short of a wall of a maximum security prison. And now we find out, in fact, our neighbors have some razor wire on it today. I don't know if ours will get some. So the wall that was built created, with respect, well, it divided the property in half. This was a contiguous farm for 80 years. I mean, it was contiguous. It was treated as such. We have riparian rights. The defendant has riparian rights that we use water and pump it under the levee. We had roads that were cut off that went over the levee. We used equipment. And it's advantageous in a resale to have a contiguous piece of property. What this wall did, what does, is create kind of a bowl. In fact, I look at it as a bowl. It's an 18-foot maximum security prison wall that now has 120, about half the property, south of it with the river to the south of that, kind of a no man's land, for lack of a better word, between the actual border and sort of this re-established border that, again, we really aren't challenging the necessity or efficacy of that wall. That's not what this case is about. I actually personally see benefits in that. But they needed to do it the right way, Your Honor. And had they come to us in 2008 and asked and negotiated a price or condemned it at that time, we wouldn't be, I promise you, we would not be here. OK. Well, I appreciate all that. Now, the question that we're supposed to be foremost here is whether this expert's testimony can be admitted. And the expert, exactly what do you want him to testify to? I thought it had to do with the value of the wall, either the concrete and or the metal on top of the concrete on that pre-existing easement. Or does it have to do with that plus what you call the no man's land? No, it is just what you said, Your Honor. What's an issue is the value of the thing that was attached to our property in 2008. And how that is determined is still a jump ball. We've asked for discovery on what the government spent, how it assembled it, and the circumstances, for goodness sakes, in which they assembled it all seem perfectly relevant to this case. And yes, we have argued in the lower court that the correct standard is replacement value. And so our expert, using information from the public record, because we couldn't get discovery, but there is actually a lot of information in the public record, assembled an opinion as best he could without the discovery we sought with respect to what the value of this improvement is. And of course, the court held, in part, that the only value you were entitled to would be the metal part on top, didn't it? It held that. Yes, ma'am. Yes. So what's your response to that? Well, first of all, I would describe that as a preliminary ruling. I think it's clear that the court holds that at least part of the wall doesn't conform to the easement. We aren't conceding as a legal matter that you don't judge this the way this court has judged every other improvement in every other case, which in its totality. The fact that it had incidental flood control purposes, I mean, I don't know if there's a governmental study that says, well, we need the first five feet of the wall to control flood. But that entire structure, including a lot of the concrete, is not necessary to control flooding. How high is the concrete? Your Honor, I believe 12 feet. I think the bollards go up to 18 feet and vary in heights. But I'd have to go back and actually look at the. Are there pictures of it? Yes, there are, Your Honor. In fact, there's five on page 531, ROA 531 and 532, among other places, is a picture of the levee as contrasted with the wall itself, which is 533. And our point is that we get to put on evidence. Honestly, having been deprived of our opportunity to conduct discovery, the factual allegations we make in here today should be assumed as true by this court because we should have the opportunity to do discovery in the lower court. Prove it. What we're going to prove is this is a unitary wall built with money that was appropriated for national security concerns, that their story about flood control is a pretext. I mean, it would be one thing if they had checked the IWC's rights and actually done a study and decided, yeah, this is how it can interact with the levee. The levee still exists. The levee is still there. This isn't a supplement of the levee. We understand that. The other part of his, I mean, I don't want to take away from my colleagues asking questions, but I believe the other part of the ruling was about the government's assertion that even if it is a trespasser, the government has an exception to the rule in Texas law that the landowner ordinarily gets value of the trespasser's improvement. Well, luckily, Your Honor, we have a Supreme Court case that everybody agrees applies and is still good law. Even the government agrees that Searle is good law. They try to distinguish it. What does the Searle case say? The Searle case says that regardless of who built the improvements, the landowner receives value for those improvements. What source of law was Searle applying? Searle was a Colorado case basically construing the Colorado Constitution, but the words were identical. The words in the Colorado Constitution are identical to the Fifth Amendment. So I think it's fair to say that it would be unlikely that the Supreme Court would construe a federal constitution more narrowly as having fewer rights than the state constitution. I'm sorry if I interrupted. Counsel, I have a question about 1292B. I'm sorry? I have a question about 1292B. Have you read our court's decision that was published on January 3rd called Silverthorne Seismic LLC? Are you familiar with this case? You can be forgiven. It's very late breaking. And I'd be curious about your thoughts about this. Published opinion by Judge Smith on our court that vacated as improvidently granted a 1292B certification and said the reason that it was improvidently granted is because the issue certified was a damages question and that, therefore, it was not controlling. Because even if we had answered the 1292B certification, the case was going to have to go back to the district court. There was going to be all sorts of other litigation. So it didn't meet the controlling standard. Obviously, I'm sympathetic to the 1292B certification in this case, having been on the panel that granted it. But I'm curious, you've said a lot today about discovery and additional things that need to be going on in the district court, whether and to what extent whatever we do today is controlling. I mean, really, the heart of why we're here is to avoid two trials. And having been cut off from discovery, granting discovery is not going to create reversible error. Denying discovery will. And what we are saying is that there are fact issues aplenty that the Supreme Court itself has said that you judge the good faith, you apply the good faith, the equitable exception that the court recognized in Searle by looking at the facts of the case. And that's all we're saying. So my answer to your question, Judge Oldham, is that this is different. We aren't asking the court to prescribe a measure of damages. Now, Judge Crane has already given his views on that. But presumably, that could be an issue for another day. There are lots of other things that come up. We recognize that this court really isn't going to insulate the final judgment from the possibility of appeal. But on this important issue of whether the threshold issue of whether we get to discovery, we get to put on evidence of the value of the wall. Correct me if I'm wrong, speaking of the value of the wall. The value of the wall, that's really the heart of this dispute. The value of the wall, in your view, is approximately $6 million. The underlying condemnation at issue is approximately $600,000. It seems like the latter is undisputed. If we were to agree with the district courts, does the dispute fall away and the parties are otherwise in agreement or can reach a settlement? Would you expect that? No, let me describe how that sequence went. Yeah, federal statutes sort of prescribe this sort of negotiation process, which is what I've expected. I've never done this. I'll be honest, Your Honor, I've never been involved in a condemnation action in my life. I've spent my career as an itinerant Chapter 11 lawyer. And so I expected there to be a negotiation between us and the government. We'd go back and forth. And really, we got a number from the Army Corporate Engineers originally. And that is the amount that was put into the registry of the court. But the expert report, and again, I don't want to get into settlement discussions, but the statute just prescribes that those occur and they didn't. And if you look at their expert report, they now say we're entitled to $9,000. I think one of the things that said Judge Cranoff was, they argue not only do we not get the value of the wall, but because the wall existed on the date of the taking, we don't get the benefit of the before and after test because before, the wall stood. After, the wall stood. So they're saying that they get the benefit of having come onto our property. Judge Cranoff has found, built a improvement outside of the easement that we own. And yet, we not only don't get any value for those improvements like we would from a private party, we don't get value for the very significant degradation of value. I mean, it stands to reason that this creation of the snowman flames, as I've described it, has a significant impact on that southern property. And the government has found an appraiser that says it's zero. And I guess the aesthetics of it are zero, too, which maybe they don't think the aesthetics of it matters. Judge Crane did, and I certainly did. And we do. OK, well, you have a chance for rebuttal. Thank you. All right, Mr. Schmeltzer.  Good morning, Your Honors. May it please the Court, John Schmeltzer for the United States. Your Honors, the district court correctly held that Mrs. Bennett is not entitled to compensation for the value of the border wall that's on the levy easement that crosses her property. The issue in this case, really, we submit is an issue about what rule of decision applies. Mrs. Bennett, the landowners rely on this presumption, or the fixture rule from the common law, the presumption that if something's built and affixed to property, it becomes the property of the landowner. We submit that based on Anderson Tully, a case that this court decided in 1962, and the law in Anderson Tully that Anderson Tully cited to in the majority common law rule, that that presumption does not apply in the context of this case, where a entity with condemnation authority initially enters the property without leave, but under authority of statute and for a public purpose, and then comes back and seeks to condemn. What Anderson Tully says, the law of this circuit, is that the condemner only needs to pay for the value of the land that was taken. The public improvement. What source of law was Anderson Tully applying? Anderson Tully applied the majority common law rule, as stated in Illinois Central v. LeBlanc, which is an opinion of the Mississippi Supreme Court. When the Mississippi Supreme Court issued that decision in 1897, the Mississippi Supreme Court noted, and I'm just going to turn my notes for reference, that that rule was consistent with the law of Michigan, Iowa, Illinois, Minnesota, Wisconsin, Oregon, Pennsylvania, Alabama, Florida, and Texas, and other states. It's the majority common law rule that this presumption of ownership doesn't apply in the circumstances of this case. We cited this court to the Texas decisions, which were decided after Searle, the Supreme Court case on which the defendants rely. The Texas decisions, as cited in Illinois Central v. LeBlanc, the court that was cited by Anderson Tully, the Texas decisions are perfectly in accord with the rule of decision that we're asking this court to apply here. Speaking of those Texas decisions, I assume you're referencing Hayes and Preston? Hayes and Preston, yes. Have any Texas courts applied or rejected Hayes or Preston? I'm not aware of any Texas courts doing so, Your Honor. They've just been untouched since their issuance? We cited a 1930 case that also relied on Hayes and Preston in our brief. And I apologize if I'm blanking on the name. Those are the cases we found. And of course, in 1962, this court decided Anderson Tully, and not a Texas case, so not necessarily applying a Texas law, but on the choice of law question that Your Honor, I think, is speaking to, whether it's federal law, whether Anderson Tully applied federal law, right? If it applied federal law, it was relying on the majority rule and the Mississippi rule, because that case arose in Mississippi. But if it's the rule of federal law, then Anderson Tully decided the federal question. And that's the rule of law that we cite in our brief on page 9. And the other thing I want to be sure the court is clear on, and the defendants here contend that we have raised this argument, this Anderson Tully argument for the first time on appeal. We didn't raise it below. Everybody agreed that Searle governed. Well, that's just not the case, right? The very first time this issue arose, we cited this quote that's on page 9, which is the controlling quote from Anderson Tully. We cited it in our opposition to the motion to compel discovery. And that's a record on appeal 363 through 65. We cited it again when we moved in Lemonade to exclude this evidence. And that's a record on appeal at 2292 through 93. We continuously relied on Anderson Tully, right? Anderson Tully, the rule of law that's stated in Anderson Tully clearly says, even if the initial entry is tortious and wrongful, the government can come back and cure, right? So even if this was a pretext, we don't agree that it was a pretextual taking. We were taking more land. We have additional purposes. But even if it's pretextual, that doesn't mean they get to claim the value of the law. That's not the law of the court. Has any court applied the trespass rule against the federal government? Not that I'm aware of, Your Honor. We haven't found any. No. The cases that the defendants cite, the case in Buehler, that's not a trespass rule case. That's a case where the government built improvements, and then the land and the improvements in their entirety were sold in surplus, right? There was a complete surrender and alienation of any claim to right and title in any of the land. In that context, if we acquire the land back, the general rule of takings applies. You take the land as you find it, right? Ordinarily, the history of ownership and what the particular owner paid, and who he paid, and how much he's out of pocket doesn't matter for compensation and takings. That's the rule of Buehler. Buehler is not a case like this, where there's a follow-up formal condemnation proceeding after an inverse or a taking by what we've been calling the seizure method. And the other thing that the court should bear in mind is there's a reason that that presumption of improvements fixed to lands doesn't apply to the federal government. And the reason is it can't equitably be applied in that particular context. The court has to keep in mind where that rule came from, right? If I build a house on your land, one of your land, your honors, and you bring suit against me and succeed in proving the superiority of your title, you get to eject me. That's the general presumption. It's your property. You get to eject me from your land, right? And you get to keep the house. And that's fair because I can't take the house with me, right? I get to keep my watch because I can walk out with it. I can't keep my house because it's affixed to the land. And that's the fixture conundrum, right? If it's affixed to the land and somebody has superior title, ordinarily, when you're talking about private parties, the person with superior title has to be able to keep the improvement, or else you've effectively granted the person who built that improvement a right in the land, right? In the private context, you can't do that. There's an exception, right? Equitable exception. But ordinarily, that doesn't get you title, right? Ordinarily, it gets you a claim to compensation. And the theory there is if you've done your due diligence, if you've checked your title, if you've done everything you're supposed to do, and you've essentially built your house innocently, right? You thought you had title, the sense is if you've done that and you've added value to the real owner's land, that fairness dictates that that person shouldn't get that entire windfall, right? But that puts a burden on the landowner, right? I put my house on your land, you don't want my house, right? You didn't ask for the house, and you may not have the wherewithal to pay for it. That's why that exception, right, is a narrow good faith exception in that context, right? In the context of a taking, where there's no question, and Mr. Bennett said it, there's no question about the government's right to have the wall here for border security purposes. There's no question about the government's authority to have it here, right? And so once the government pays for the land, which it had brought this action to do to pay for the land, the government has acquired nothing tortiously, right? That's what the rule is about, not allowing somebody to acquire a right tortiously. Once we pay for the land, we're just asking to keep our wall, right? We paid for the wall, we put the labor into it. It's our supplies, our labor. There's no sense in which the defendants ever own the wall. And that's the other problem with applying this rule in the context of takings, right? There's no relationship between the value of the improvement and the alleged wrong that was done. I mean, ordinarily, the law and the law of equity certainly places, you know, when it imposes a penalty or a measure of damages, it's commensurate to the injury to the property owner, right? There's no injury to the property owner here. Well, they have several theories of injury, but one of them is the fact that this no man's land concept and the aesthetic injuries of the wall, how does that factor into, I mean, if I'm understanding the mechanics of how the suit happened, the government just determined a number, 600 grand, and just put the money into the registry. What happens if, I mean, can Judge Crane determine that, well, that might have been true if you'd built it along the river, but you didn't. You built it an acre in. It might have been true if the wall was six feet tall instead of 18 feet tall. Like, is there a, what happens if it turns out that that number is too low? That's why there's a trial, but the ordinary process of takings is we put, we evaluate, we determine what we believe the value is, we put that money down so it's there, right? And then at the date of the declaration of taking, there's no more dispute over title because we're then formally the title owner. When I say there's no theory of injury, I should back up and nuance that a little more. Their theory here for compensation is that the wall was taken from them, right? They have placed no ownership interest. They have no value in the wall as owning the wall. They've never owned the wall in any way, and of course, they complain about the wall. They don't want the wall. Let me ask you this from what Judge Oldham is saying. Before, there was a road across the levy, and presumably, they could at any point in time, it's just like condemning anything for a road that bisects a property, you can cross the road, or your cattle can cross the road, or your farm equipment, but now they can't. Well, that's just not true. There's an opening in the wall, and that's in the record, and we cite it in the brief. Part of the reason for this was to build a gate which allows them access, but if a federal taking, right, if by putting the wall there, we have cut off their access and then diminished the value of the property, that's something they can recover in the taking as a claim that our property, our land, has now been reduced in value, but this case is about just a narrow issue. It's about the value of the wall and whether that's a compensable value in this case. It's not about what did the wall do to the property. I don't believe, Your Honor, that there's value you can recover in a condemnation case, aesthetic loss, right, because your neighbor can build whatever, you know, as long as it's within your neighbor's rights to build, your neighbor can build an ugly building next to you, so the government can condemn land and build an ugly wall, and if it's just an aesthetic value, I don't think that's compensable, but with respect to a no man's land or if we have somehow reduced the value of these lands, those are all issues that get to be argued at trial you know, when we go back. The reason we took a timeout to come to court here is to determine whether, you know, they get an extra six million dollars, which is how they value the wall, as a complete windfall, right? The entire ranch, per their experts, is evaluated at 1.7 million dollars, right? We are taking a sliver of that ranch in this declaration we're taking to support the wall and our operations along the border, and it's a sliver that we evaluated at 100,000 dollars, or, and they came back and evaluated 500,000 or six, I think is the figure your honor gave. When they evaluated that 600,000 dollars, they didn't count for the fact that there's already a levy easement there, right? We're not saying that in this context and in this appeal that in evaluating the land value when we go back, that the wall has to be there, right? Well, we said below that when they evaluate the injury to them from this taking, they have to count on the fact that there's been a levy there for, since 1930, or whenever the levy's been there, right? That's the pre-existing fixture that's already there that has to be accounted for, and so the question in terms of evaluation is when you put a border wall on an area of their land, right, the levy easement, that they already can't use for farming, they can't use for ranching, because if you, you know, they can't use for building, because if you do any of those things, you interrupt the integrity of the levy, right? So they already can't use this, right? And so we're putting up a border wall that, in an area that they already can't use. So, I mean, it's not really an issue in this case, but I just want to point that out for the court, because, you know, there's been a lot of complaints about, you know, the terrible things we've done, and how obvious it should have been that we should, should have done this, you know, ahead of time, and condemned the whole fee in the first place, right? We don't concede in this proceeding, necessarily we had to do that, right? It's our view that the levy easement was broad enough, but that issue's not the direct issue here either. The direct issue here is only, right, do they have a right to the wall? And if you look at the law of this circuit, right, in Anderson Tully, that we quote on page nine of our brief, it's clear that the government enters without leave, right, government enters tortiously, those things don't give them the right to the wall. Let me just. So, if we were to reverse, just, I don't, one other thing, if we were to reverse, at what point would this become a claim on their part that had to go to the court of claims? Would it at all? Not in this case, and we were only just pointing out in our brief that they could have brought a claim to the court of claims. The issue really would become, and we cited in the brief that, what's the date of taking, right? If you look at it in the context of this was pre-textual and we're just doing the same thing that we started in 2008, there are some courts that say you can back up the date of taking. So that would be a Tucker Act thing? No, no, no, I'm saying in the direct condemnation. We cite in our briefs. Inverse condemnation. No, no. No? In the direct condemnation case, there's a dispute, right? In a direct condemnation case, whether they can expand the complaint, right? The normal rule is the government is in charge of a complaint and a taking, right? So if we say we were taking a fee interest as of 2020, right, the ordinary rule is the date of taking is 2020 and the value of the land is determined as of 2020. What they have said in this case, in effect, is that we took land in 2008. And we can see that if we exceeded the scope of the easement, there was a taking in 2008. I see what you're saying. They could have brought that in the Court of Federal Claims and then the date of taking would have been 2008. What I'm saying is now there's an open question, potentially, as to what is the date of taking that can control the direct condemnation case. Because there are some courts, right, that have said that in the direct condemnation context, where it's just a continuation of a taking that started without formal condemnation proceedings earlier that the court has the authority to determine the date of taking and to award compensation from that date, right? As we note in our brief, it doesn't necessarily increase their value here, right? Because it depends on prejudgment interest versus the increase in the values of the land, right? But it's not an argument they made here, right? We don't agree that that's the right rule that you can back it up, but that's not for this court now. If they want to raise that court below, we'll have that argument, and then we can talk about it again, you know, if it makes a difference in this case, right? It's not the issue before the court now. We only raised that so the court could understand that they had a remedy immediately, you know, if this was a major imposition and they didn't take it. And what we did here by bringing a direct condemnation claim is give them a second bite it, but we're purchasing the land regardless now, right? It appears like you're also making an imminent domain argument to this court that was not made below. Am I wrong about that? And if I'm not, can we reach that argument? Have you either waived it or in light of the scope of 1292B, is there some difficulty with us reaching your imminent domain argument? No difficulty, Your Honor, for what I already stated, right? We relied on Anderson Tully below, right? That's an argument about that was an imminent domain case and it was a case in which this court addressed facts that are very similar to this one, right? Where there's a formal condemnation that preceded essentially a seizure of the property. And the rule that the court announced, right, is the rule we're asking this court to apply. And it's a rule that goes to the issue that was in the order that was certified. Now the court certified a narrower question, but the law of the circuit and the law generally is that when an issue is certified, it's the order that's certified, not just the question. And the general issue in the order is compensation. Do they have a right to compensation for the value of the wall? As I said at the outset, the very first time that issue came up, we cited Anderson Tully. All we're asking this court to do is to follow Anderson Tully, a case that was decided 60 years or so after Searle. And let me just say, final point, a couple of things about Searle, right? We think Searle's instructive because it shows that this rule can't be applied when it can't be done so equitably. But Searle is not directly controlling because it applied Colorado law, right? It didn't involve a federal taking. It didn't involve any federal question. It was in diversity jurisdiction, I believe, that the court ended up with the case. And the facts were different, right? I understand, but why did we not follow Anderson Tully and Buehler? Right, because Buehler didn't, it wasn't a follow-up condemnation. It wasn't the facts of this case at all. But it's a condemnation action after government improvements, and then the government improvements are included in the condemnation award. Is that, I mean, at that level of generality, that's this case, right? I mean, I realize there was a lease, and there were other- But there's a huge distinction in the fact that in between, we sold the land. We gave up all rights to the land. We gave up all rights to the fee. We gave up all rights to the improvements. We effectively washed our hands of it and said, we're gone, right? And then some years later, we came back and said, oh, this would be a good place to have an airbase. And we tried to condemn it again. In between, the landowner could have sold it to another person, right? And if the landowner had sold it to another person, they would have been entitled to the fair market value, including the improvements. All we're saying is when we come back after having sold the land in its entirety with all its improvements and say, well, we want it again, the idea that we, some decades ago, years ago, however long ago it was, the idea that we initially built it or added value to it is no longer relevant because we've severed our ownership-like connection, right? In this case, the Customs and Border Protection, the United States never severed its ownership connection with the wall, right? We built it, we maintained it for border security purposes. There's no sense that we gave up possession or control. There's nothing, there's no event that the court could look to as the point where we sold it in surplus or did anything to leave or abandon our interest in it, right? We built it to do something and we always used it for that purpose. And so it's just not analogous to Bueller. Thank you, sir. Thank you, Your Honor. We ask for the district court's opinion to be affirmed. Yes, sir. Mr. Bennett. Judge Oldham, you're exactly right. Bueller is the later decided case on facts in all respects identical really to Anderson Tully and decided the case the opposite way. There are differences and it's important having read now many, many 19th century railroad cases and condemnation cases. These cases depend on the facts of the case and you have to really dig into them because when you see some of this broad truism expressed in the Texas courts, you find out later that, well, the condom knee wasn't the owner at the time that the improvements were built, for example, in one of the cases, the condom knee. And so, I'm sorry, Your Honor. Okay, you're on rebuttal. And I think it would be best use of your limited time to tell us which cases, A, B, C, you rely on are the best for your case, is that okay? Bueller is on point. The government had the right under the lease to build the improvements. Contrary to the government, the government is incorrect. That property was not sold to the condom knee. The lease terminated. Read the lower, read the district court decision. The lease terminated, so by operation of law, this airport built in World War II for important national security reasons reverted to the people in Victoria just a few hundred miles north of us. And then, the jet age hit. Migs against Mustangs. And airports all over South Texas, San Antonio, Kingsville, Corpus Christi, and yes, Victoria. Texas is a great place to train young pilots, and this was one of those airports. And sure enough, these improvements that were in the hands of the landowner all of a sudden became incredibly valuable to national security of this country, and the government went in and condemned the property it had previously leased.  Ownership of those improvements weren't disputed. Ownership of those improvements were in the landowner, but there was no argument made that because the government had paid for them, that's what their argument. Their argument, if the government pays for improvements, it doesn't matter because we owned the improvements. There's no dispute that under Judge Crane's rationale and the application of Texas law, the Bennetts owned the improvements that fell outside of that easement. There's no other possibility. It's either us, or the International Boundary and Water Commissioner. Those are the only two record owners of this property. And the easement, frankly, this wall doesn't conform to that easement, but even if part of it does, the rest of it doesn't, and we own the improvements. That's what Judge Crane found. The question is, because the government paid for those improvements, should it be excluded? They're asking for an absolute exemption, and that's not what Buehler says. Buehler says, and Buehler, Judge Hendricks, there was more, in today's dollars, there was more than $10 million in issue when it came to the damages around that dusty South Texas land. And improvements are often a multiple of the underlying land, as this court is well aware. The improvements in that case, proportionately, were much more valuable. The issue before the court today is not windfall. The issue before the court today is the application of fundamental constitutional principles that they want to rewrite or do away with. Because what they're saying is, if you listen carefully, is that the property is owned by whoever we say it's owned by. And the public treasury takes precedent over private property rights, excuse me. And so, Buehler and then Searle. And I understood your question to be, Judge Hendricks, is there a possibility that Hendricks could only apply to state actors? No way. No way the Supreme Court would say, hold itself, hold a state actor to the standard and say the federal government can run amok. And if it is permitted to run amok by this court, what's gonna happen? The improvements will be built on property. 80-year tenured farmers will have their land interrupted because there's no consequence. In fact, there's a benefit in their view to having done what they did. Even though it's unprecedented and quite frankly shocking on its face, they're saying that, and they begrudge us, they said we're trying to seek a windfall, but then they acknowledged we didn't go run into the court of claims to establish liability. We were just trying to farm our land. And they say, because we did this, even though you own it, you not only don't get the value of the improvements that you own by operation of Texas law, there is no federal property law, that you don't get those, those are just excluded. You don't get the before and after test and their appraiser says we're owed a princely $9,000, which is honestly, Your Honor, ridiculous. And the kind of thing you would see in commercial disputes, and I don't know what happened in Buehler and how it changed till today, there was no issue about the public treasury paid for this, the people owned it by operation of Texas law and they got to be compensated for it. Now, how you calculated it, Judge Jones, difficult, clearly, no doubt about it. And I don't know that the constitution now permits, if they did a panel back then by procedural rules. Well, it's 900,000 plus a half million, right? I beg your pardon? 900,000 plus a half million. You mean in that case, you mean in the Buehler case? That's in the registry of courts. No, they put 118,000, that's all they, that's the original offer and that's never gotten any higher. But what they say now, is that they're gonna get 109,000 of that back. Because if you look at their expert witness report, in total, he says that the damage to our property is $9,000. And part of, if you just look at the pattern of conduct here, including that expert report, Your Honor, and I'm out of time, thank you. Okay, thank you, sir. Very interesting case, we appreciate your arguments. We'll call the next case.